## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

MELANIE E. DAMIAN, AS RECEIVER OF      CASE NO.   1:20-cv-11066
TODAY'S GROWTH CONSULTANT, INC.
(d/b/a THE INCOME STORE)

          Plaintiff,

v.

CLICK INTELLIGENCE LTD.,

          Defendant

_____

### COMPLAINT

Melanie E. Damian, a court-appointed receiver ("Plaintiff" or the "Receiver") in an enforcement action brought by the Securities and Exchange Commission (the "SEC"), files this Complaint stating claims for fraudulent transfers and unjust enrichment against Defendant, Click Intelligence Ltd., and states:

### PROCEDURAL HISTORY

1. On December 30, 2019, the United States District Court for the Northern District of Illinois, Eastern Division, case no.: 1:19-cv-08454, entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief ("TRO") and an Order Appointing Receiver ("Appointment Order") in an SEC enforcement action (the "SEC Action"). *A true and correct copy of the TRO and Appointment Order are attached hereto as* **Exhibit A and Exhibit B**. In the TRO, the Illinois District Court ordered all of the Defendants' assets frozen to preserve the *status quo*. *See* Exhibit A at pp. 6-7. Further, the TRO ordered the preservation of all Defendants' documents, books and records concerning (1) the allegations of the Complaint, (2) any securities offered for sale by Defendant Today's Growth Consultant, Inc. (dba The Income Store) ("TGC" or the "Receivership Defendant"), including, but not limited to Consulting

Performance Agreements (each an "Agreement" and collectively, the "Agreements"), (3) any communications with, between, or among either Defendant. *See* Exhibit A at pp. 7-8.

2.     Additionally, TGC and Kenneth D. Courtright, III ("Courtright") were each ordered to provide a sworn accounting to the Illinois District Court detailing, among other things, each Agreement entered into by TGC, each loan or indebtedness entered into by TGC, all current assets and liabilities, and any transaction of $10,000 or more. *See* Exhibit A at pp. 8-11.

3.     The Receiver's mandate was to take all actions necessary to implement the terms of the TRO by, among other things, taking possession, custody and control of all of Defendants' assets, establishing control of TGC's business, ensuring that Defendants' assets were frozen and preventing their withdrawal or misapplication, obtaining and preserving documents and records pertaining to Defendants' assets, transactions, and business operations, and performing all acts necessary to protect and preserve the Receivership Estate. *See* Exhibit B at pp. 2-4.

4.     The Receiver analyzed the business operations, including projected and historic income and expenses and determined that without additional investor funds the operations were not sustainable even in the short term. Even with substantial infusion of investor funds, the TGC/Income Store records indicate a loss in 2018 of $5.7 million and in 2019 of $7.5 million. Indeed, the payroll expense alone exceeded TGC's website/e-commerce revenue.

5.     The Receiver's review of TGC's books and records confirm the SEC's allegations that new investor funds and loans, and not website revenue, were used to pay the investors/website partners.  For example, in 2018 website revenue was under $2 million while the purported website payout to investors was approximately $12.7 million; and, likewise, in 2019 website revenue was under $4 million while the purported website investor payout was $16.5 million.  In short, TGC's business was a Ponzi scheme orchestrated by Courtright.

6.     On March 2, 2020, the Illinois District Court entered two separate stipulated preliminary injunction orders titled Order Imposing Preliminary Injunction Freezing Assets and Granting Other Relief (collectively, the "PI Orders") against each of the Receivership Defendants, TGC and Courtright, which shall remain in effect until the Illinois District Court's determination of the merits of the allegations set forth in the SEC's Complaint or further order of the Court.  *A true and correct copy of the PI Orders are attached hereto as* **Composite Exhibit C**.

### THE PARTIES

**The Receiver**

7.     Plaintiff, Melanie E. Damian, was appointed by the Illinois District Court as Receiver.  Plaintiff brings this action in her capacity as Receiver, pursuant to the authority granted by the Illinois District Court in the TRO, Appointment Order and the Stipulation and each of the PI Orders entered in the SEC Action.

**The Defendant**

8.     Defendant Click Intelligence Ltd. ("Defendant" or "Click Intelligence") is an international internet marketing agency based in the United Kingdom (the "U.K."), with an office in New York City, New York. According to its website (www.clickintelligence.co last visited Dec. 9, 2020), Click Intelligence offers a variety of services "from on-site audits to content creation, to paid search marketing, blogging outreach and link building strategies."  At all times material hereto, Click Intelligence received substantial amounts of funds from TGC purportedly in exchange for "link building" services that did not provide value to TGC.

9.     The payments that the Defendant received from TGC, which the Receiver is seeking to recover in this action, were obtained from the investors (a/k/a "website partners") and creditors TGC had defrauded in connection with the fraudulent scheme that Courtright perpetrated through TGC.

3

## JURISDICTION AND VENUE

10.     This Complaint is brought to accomplish the ends sought and directed by the Illinois District Court in the SEC Action, which, among other things, appointed Plaintiff as Receiver and authorized her to commence actions to recover assets of the Receivership Estate.  This action is related to the claims in the SEC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Additionally, this Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs. Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a).  Therefore, this Court has subject matter jurisdiction over this action.

11.     This Court has personal jurisdiction over Defendant because Defendant's U.S. office is located in New York City, New York.  Defendant received transfers from and/or conducted business with TGC, which in turn was conducting, engaging in, and carrying on a fraudulent business or venture in, among other locations, the Southern District of New York. Further, the transfers that Defendant received from TGC's bank accounts in Illinois were proceeds from TGC's fraudulent scheme conducted, in part, in the Southern District of New York.

12.     Venue is proper in the Southern District of New York, pursuant to Title 28, United States Code, Sections 754, 1391(b), and 1692, because this action is brought to accomplish the objectives of the TRO, the Appointment Order, and the PI Orders and is thus ancillary to the

Court's exclusive jurisdiction over the Receivership Estate.  Further, several of the acts described in this Complaint occurred in the Southern District of New York.

## THE RECEIVER'S STANDING
## <u>TO BRING THE CLAIMS ASSERTED HEREIN</u>

13.     The Receiver has standing to bring the claims asserted in this Complaint pursuant to the Illinois District Court's TRO, Appointment Order, and PI Orders.  The Receiver's mandate was to, *inter alia*, take possession, custody, and control of TGC's assets, establish control of TGC's businesses (to the extent they exist and continue to operate), prevent the withdrawal or misapplication of TGC's funds, collect funds due to TGC, obtain documents and records pertaining to TGC's assets, transactions, and business operations, and perform all acts necessary to preserve the value of the Receivership Estate.  *See* Exhibit B at pp. 2-4.

14.     Pursuant to the Appointment Order, the Receiver was directed to "assume and control the operation of Receivership Defendant and shall pursue and preserve all claims or interests of the Receivership Defendant. The Receiver may continue and conduct the business of the Receivership Defendant in such manner, to such extent and for such duration as the Receiver may deem to be necessary or appropriate, if at all."  *See* Exhibit B, at p. 3.  Included among such claims are fraudulent transfer actions to recover for the benefit of the Estate amounts that TGC fraudulently transferred to insiders, affiliates and third parties.

15.     The Receiver, on behalf of receivership entity TGC, as a "creditor" of TGC as defined in 740 ILCS § 160/1, has standing to bring the fraudulent transfer claims asserted in this Complaint under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS § 160 and common law unjust enrichment claims pled in the alternative.

## FACTUAL ALLEGATIONS

### The TGC Fraudulent Scheme

16.     From at least 2017 through October 2019, TGC and Courtright raised at least $75 million from more than 500 investors who entered into "Consulting Performance Agreements" with TGC (the "Agreements") pursuant to which the investors would provide up-front payments and ongoing payments in the form of advertising and eCommerce revenues to TGC, and TGC promised to pay investors a minimum guaranteed rate of return, in perpetuity, on revenues generated by websites that TGC acquires or builds for the investors and then develops, maintains, and hosts.

17.     In Particular, under the Agreements, each investor was guaranteed a percentage of the revenues of the websites that would be assigned to them or a minimum annual guaranteed return (ranging from 13% to 20%), to be paid monthly, even if the website did not generate sufficient revenue to pay the promised monthly payment.

18.     The Agreements tout TGC's experience and expertise, informing investors that TGC's "growth formulas" with a foundation in page one Google placement as well as a tailored eCommerce strategy would build a bridge to an array of revenue streams for the investor sites.

19.     Further, under paragraph O of the Agreements, the investor's up-front fee was to be used "exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website…".

20.     And, TGC represented to the investors that it is in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties" and that it is "debt-free . . . with no accounts payable or loans outstanding."

21.     The foregoing representations to investors were false and not supported by TGC's own records.  Indeed, the revenue that was generated from all of the websites each month was

significantly less than the monthly payment obligations to the investors and certainly was not sufficient to cover both those monthly payments and TGC's monthly overhead expenses. In addition, despite contrary representations to the investors, the websites and domains with minor exceptions were maintained in the name of, and owned by, TGC and not the individual investors. And, TGC, for at least the past three years, was not solvent or financially able to pay its bills when due (without the improper use of new investor funds) to meet its contractual obligations.

22.     In particular, since at least January 2017, the websites generated approximately $9 million in advertising and product sales revenue, but TGC paid at least $30 million to investors, purportedly pursuant to the Agreements.

23.     In 2019 alone, according to the Profit and Losses accounting from the company's records, website income was $3,724,809.00, but TGC paid $16.5 million to investors. And, TGC generated "revenue" in the form of investments from investors (its largest source of revenue) of approximately $41.5 million and had operating expenses in the amount of $34,653,706, resulting in a net loss of $7,520,873.

24.     And, prior years reflect a similar discrepancy in revenues generated from investors in comparison with the amounts paid to investors based upon their investments.

25.     TGC also obtained loans from distressed lending companies and deposited the loan proceeds into the same TGC bank accounts into which TGC deposited the up-front payments it received from investors and the revenues from the websites.

26.     Because many of the websites were not generating sufficient revenues for TGC to pay the amounts due to the investors under the Agreements, TGC covered the significant shortfall primarily by using up-front fees it obtained from new and repeat investors who had entered into Agreements with TGC, and also by using the commingled proceeds of significant loans it received

from lenders, to pay the minimum monthly payments it guaranteed to earlier investors under the Agreements, and to make payments towards the loans.

27.     Because TGC's business depended on the use of new investors' up-front payments (and perhaps loan proceeds) to cover its obligations to earlier investors, TGC was a classic Ponzi scheme.

28.     Based on the Receiver's analysis of TGC's operations and books and records, this business model as implemented by Defendant Courtright was not sustainable, feasible or profitable.

29.     In fact, TGC's business model resulted in significant losses to most of the investors. Some investors received the return of their full investments plus additional amounts making them net winners, because they were early investors who received payments over a longer period of time before the commencement of the SEC Action, or Defendant Courtright chose to pay them more than the amounts due to them under the Agreements.  But the majority of investors received back significantly less than they had invested or nothing at all because they invested closer in time to the commencement of the SEC Action, or Defendant Courtright chose not to pay them the amounts due to them under the Agreements making them net losers with a potential claim against the Receivership Estate.

**Preliminary Findings of Fraud Against TGC**

30.     As a result of this fraudulent behavior, the SEC commenced the SEC Action against TGC that resulted in entry of the TRO and PI Orders containing preliminary findings that TGC likely participated in a fraudulent securities scheme.

31.     At all times material hereto, Courtright, as principal and President, controlled and operated TGC as a means to carry out the fraudulent scheme, thereby causing TGC to commit

violations of securities laws and rules, in breach of his fiduciary duties to TGC. TGC was under the control of Courtright until the appointment of the Receiver and thus unable to seek recovery of the fraudulent transfers prior to that point.

32. TGC made the transfers at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

**The Insolvency of TGC**

33. As a result of operating a Ponzi scheme, TGC was insolvent, undercapitalized, and operating at a loss. During all relevant times, TGC did not have sufficient assets to pay its debts to investors and/or creditors as those debts became due.

34. Because most investors have not received the return of their investment or all of the amounts due to them under the Agreements, these investors will have significant claims against the Receivership Estate to recover their investments.

**Transfers to Defendant**

35. From April 17, 2017 to May 18, 2018, TGC made approximately 9 transfers of funds (the "Transfers") in the total amount of at least $869,175.00, to Defendant. Most, if not all, of the transfers originated from TGC's bank account located in Illinois. *See Summary of Transfers to Click Intelligence, attached hereto as* **Exhibit D**.

36. The funds comprising the Transfers to Defendant were funds that TGC and/or Courtright fraudulently obtained from investors and/or creditors in the form of investments, fees and/or other payments made in connection with the Agreements.

37. Defendant received the Transfers without providing reasonably equivalent value to TGC in exchange for those Transfers.

38.     Further, any services that Defendant may have provided to TGC only facilitated and perpetuated the fraud against current investors and recruiting new investors.  Thus, not only did Defendant not provide any reasonably equivalent value or any other benefit to TGC, but also Defendant increased the damages suffered by TGC by increasing the amounts owed to investors and creditors which will be reflected in any restitution that TGC will be required to pay.

39.     When TGC made the Transfers to Defendant, TGC intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due.

40.     Thus, TGC had the actual intent to delay, hinder, or defraud investors and creditors, and made the Transfers to delay, hinder, or defraud investors and creditors.

41.     TGC, and thereby the Receivership Estate, have been damaged significantly as a direct and proximate result of the Transfers as alleged above.  Such damages include, but are not limited to, losses due to the dissipation of investor funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

42.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, misappropriated, or lost from TGC as a result of the fraudulent transfers to, and unjust enrichment of, Defendant.

43.     All conditions precedent to the bringing of this action have been performed or satisfied or have occurred.

44.     The Receiver was not appointed to take control of TGC until December 30, 2019, therefore, she could not have discovered the Transfers until that date at the earliest, and she did not even begin to discover some of the Transfers until May 2020.  Accordingly, this action is brought within the pertinent statutory limitations period.  *See* 740 ILCS 160/10.

45.     Because TGC was operated from its headquarters in Minooka, Illinois, and the Transfers came from TGC's bank accounts located in Illinois, Illinois law applies to the fraudulent transfer claims brought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
740 ILCS § 160/5(a)(1)**

46.     Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 45 of this Complaint as if fully set forth herein.

47.     This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

48.     Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

     (1) with actual intent to hinder, delay, or defraud any creditor of the debtor;

740 ILCS 160/5(a)(1).

49.     The Receiver acting on behalf, and standing in the shoes, of receivership entity TGC has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright transferred from TGC to investors and/or creditors pursuant to the actual fraud prong of the statute. 740 ILCS 160/5(a)(1).

50.     TGC's Transfers to Defendant were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay, or defraud the creditors of TGC.

51.     In particular, as detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused the transfer of at least $869,175.00 in fraudulent transfers to the Defendant with an actual intent to hinder, delay, or defraud TGC's creditors.

52.     Defendant received the Transfers without providing to TGC reasonably equivalent value in exchange for the Transfers.

53.     Any services that Defendant may have provided to TGC only facilitated and perpetuated the fraud against current investors and recruiting new investors. Thus, Defendant did not provide any reasonably equivalent value or any other benefit to TGC but rather increased the damages suffered by TGC by increasing the amounts owed to investors and creditors which will be reflected in any restitution that TGC will be required to pay.

54.     At the time that TGC made the Transfers, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Illinois District Court in the TRO and PI Orders.

55.     TGC made the Transfers in furtherance of that fraudulent scheme and Ponzi scheme.

56.     At the time that TGC made the Transfers, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

57.     TGC made the Transfers at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

58.     Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the Transfers to delay, hinder, or defraud TGC's creditors.  Consequently, the Transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

59.     Because the Transfers were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the Transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

60.     As a direct and proximate result of TGC's fraudulent Transfers to Defendant, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $869,175.00, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant:  (1) determining that the Transfers from TGC to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant in the full amount of the Transfers received by Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT II

### Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(2)

61.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 45 of this Complaint as if fully set forth herein.

62.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
>
> or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

63.     The Receiver acting on behalf, and standing in the shoes, of TGC has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that TGC made to Defendant pursuant to the constructive fraud prong of the Act. 740 ILCS 160/5(a)(2).

64.     The Transfers to Defendant were made without TGC receiving reasonably equivalent value in exchange for the Transfers or obligations incurred.

65.     Any services that Defendant may have provided to TGC only facilitated and perpetuated the fraud against current investors and recruiting new investors.  Thus, Defendant did not provide any reasonably equivalent value or any other benefit to TGC but rather increased the damages suffered by TGC by increasing the amounts owed to investors and creditors which will be reflected in any restitution that TGC will be required to pay.

66.     Also, the Transfers occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when TGC intended to incur or believed, or

14

reasonably should have believed, that TGC would incur debts beyond its abilities to pay as they became due.

67.     As a direct and proximate result of TGC's fraudulent Transfers to Defendant, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $869,175.00, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant:  (1) determining that the Transfers from TGC to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant, in the full amount of the Transfers received by Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT III

### (Unjust Enrichment as to the Transfers)

68.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 45 of this Complaint as if fully set forth herein.

69.     TGC conferred a benefit on Defendant when it made the Transfers to them in the amount of at least $869,175.00, all of which were derived from the fraudulent scheme orchestrated by Courtright through TGC.

70.     Defendant had knowledge of the benefit Defendant received from TGC as a result of the Transfers and voluntarily accepted and retained the benefit conferred.

71.     It is inherently unfair and inequitable violating fundamental principles of justice, equity and good conscience that the funds of investors defrauded in TGC's fraudulent scheme are retained by and used to personally benefit Defendant (who knew or should have known of TGC's fraudulent scheme as insiders of TGC), rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and creditors.

72.     As a direct and proximate result of Defendant's retention of at least the $869,175.00 that TGC fraudulently transferred to Defendant, the Receivership Estate has been damaged or diminished, and, under the circumstances, equity dictates that Defendant should return the funds received from TGC and turn over any assets they may have acquired with those funds to the Receiver for the benefit of all of the defrauded investors and creditors.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant:  (1) determining that the Transfers from TGC to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant, in the full amount of the Transfers received by each Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

Plaintiff demands a jury trial in this action.

Dated: December 30, 2020

Respectfully submitted,

ABEND & SILBER, PLLC

By:    _____

Josh Silber  JS6070
jsilber@AbendSilber.com
432 Park Avenue South, 9th Floor
New York, NY 10016

Telephone: (212) 532-7575

and

*/s/ Kenneth Dante Murena*

Kenneth Dante Murena, Esq.
Florida Bar No. 147486
kmurena@dvllp.com
Christine M. Dimitriou, Esq.
Florida Bar No. 99381
cdimitriou@dvllp.com
Damian & Valori LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131
Telephone:  (305) 371-3960
Facsimile:  (305) 371-3965

*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*
*Pro Hac Vice Applications Forthcoming*